## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### NORTHERN DIVISION

WELLS FARGO BANK, N.A.,
3201 North 4th Ave.,
Sioux Falls, SD 57104,

        Plaintiff,

   v.

MARK P.
ROTHENHOEFER,
2905 Greenway Dr.,
Ellicott City, MD 21043,

PARAMJIT ("MONI") SINGH,
1 Adil Ct.,
Catonsville, MD 21228,

NARINDER IQBAAL SINGH,
11609 91st Ave. Apt. 1,
Richmond Hill, NY 11418.

ROTHENHOEFER BROS., INC. d/b/a
THREE BROTHERS
3061 Frederick Ave.,
Baltimore, MD 21223,

        Defendants,

Civil Action No. _____

### **COMPLAINT**

Plaintiff Wells Fargo Bank, N.A. ("***Plaintiff***" or "***Wells Fargo***"), through its undersigned

counsel, files this Complaint against Mark P. Rothenhoefer ("***Rothenhoefer***"), Paramjit (Moni)

Singh ("***Moni***"), Narinder Iqbaal Singh ("***Narinder***"), and Rothenhoefer Bros., Inc. D/B/A Three

Brothers ("**Three Brothers**," together with Rothenhoefer, Moni, and Narinder, the "**Defendants**") and alleges as follows:

## THE PARTIES

1.      Plaintiff Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota. Accordingly, Wells Fargo is a citizen of South Dakota.

2.      Defendant Rothenhoefer is an individual resident of Maryland with his principal residence at 2905 Greenway Dr., Ellicott City, MD 21043.

3.       Defendant Moni is an individual resident of Maryland with his principal residence at 1 Adil Ct., Catonsville, MD 21228.

4.      Defendant Narinder is an individual resident of New York with his principal residence at 11609 91st Ave. Apt. 1, Richmond Hill, NY 11418.

5.      Three Brothers is a Maryland corporation with its principal place of business located at 3061 Frederick Ave., Baltimore, MD 21223. Accordingly, Three Brothers is a citizen of Maryland.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

7.      Complete diversity exists between Plaintiff, a citizen of South Dakota, and Defendants, none of which are citizens of South Dakota.

8.      The amount in controversy at issue exceeds $75,000.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(1) and (b)(2) because Rothenhoefer, Moni, and Three Brothers all reside in this judicial district and a substantial part of the events and occurrences giving rise to this complaint occurred in this judicial district.

## PRELIMINARY STATEMENT

This action arises from Defendants' fraudulent check cashing scheme that has caused Wells Fargo to suffer substantial financial losses. Beginning in or around April 2025 and continuing through the present, Defendants cashed dozens of U.S. Treasury checks bearing forged endorsements and altered payees, depositing these fraudulent instruments into the Three Brothers account at Wells Fargo. Wells Fargo negotiated the checks and funded the money into the Three Brothers' commercial banking account. Months after these checks were deposited and Defendants had withdrawn the funds, the U.S. Treasury issued reversal notices for at least 50 checks totaling $1,011,354.98 and recouping those amounts from Wells Fargo due to forged endorsements and altered payees. Hundreds of additional similar treasury checks are pending potential reversal, which checks flooded into the account after Wells Fargo discovered the scheme and subsequently informed Defendants that they were closing the account. Account funds are insufficient to cover the reversals and potential losses. Defendants perpetuated the scheme because Rothenhoefer fraudulently concealed from Wells Fargo his December 2021 sale of the Three Brothers business to Narinder and Moni. Indeed, for years after the sale, Rothenhoefer falsely certified that he remained the 90% owner and compliance officer—representations he knew to be false and made to preserve a banking relationship that Wells Fargo never would have extended to the new owners, enabling the scheme. Wells Fargo seeks compensatory and punitive damages, treble damages under RICO, and such other relief as the Court deems just and proper.

## FACTUAL BACKGROUND

### The Three Brothers Business

10.    Rothenhoefer Bros., Inc., doing business as Three Brothers, is a retail establishment located at 3061 Frederick Avenue, Baltimore, Maryland 21223, that has been in operation since 1959. Founded by brothers John, Tom, and George Rothenhoefer, John

Rothenhoefer ultimately transferred majority ownership of Three Brothers to his son, Mark Rothenhoefer by 2006. In addition to its retail operations, Three Brothers provides supplemental money service business ("**MSB**") activities, including check cashing, money orders, prepaid access, and money transmission services.

11.     Three Brothers has maintained a banking relationship with Wells Fargo for many years, holding business deposit accounts and merchant processing services with the bank. As part of its MSB activities, Three Brothers cashes checks for customers, including U.S. Treasury checks and commercial checks, with no limit on the dollar amount of checks the company will cash.

12.     Mark Rothenhoefer served as the principal owner and compliance officer of Three Brothers. In his capacity as compliance officer, Rothenhoefer was responsible for overseeing and maintaining Three Brothers' compliance program.

**Mark Rothenhoefer Secretly Sells Three Brothers to Moni and Narinder and Fraudulently Conceals the Sale from Wells Fargo**

13.     Upon information and belief, in December 2021, Rothenhoefer sold the Three Brothers business to Paramjit (Moni) Singh and Narinder Iqbaal Singh through a seller-financed transaction. Rather than receiving payment at closing, Rothenhoefer agreed to finance the entire purchase price, lending Moni and Narinder $2,828,581.11 under a promissory note (the "**Note**") referenced in the IDOT (as defined herein). In exchange, Moni and Narinder were obligated to repay Rothenhoefer $40,000 per month until the seller note was satisfied. Upon information and belief, as part of the sale, Rothenhoefer was required to stay on and help transition the business while receiving the monthly payments on the seller Note.

14.     To secure the seller Note, GREAT-ISH LLC, a Maryland limited liability company with Gurmit Singh as its Authorized Member, executed that certain Indemnity Deed of Trust, Security Agreement and Financing Statement executed December 14, 2021 (the "**IDOT**") in favor

of Rothenhoefer as Beneficiary. A true and correct copy of the IDOT is attached hereto as **Exhibit A**. The IDOT placed a lien on properties located at 3061 Frederick Avenue, 3111 Frederick Avenue, and 3125 Frederick Avenue in Baltimore, Maryland. Gurmit Singh appears to have served as a financial backer for Moni and Narinder's acquisition of the business.

15.    In December 2021, Rothenhoefer added Moni and Narinder as authorized signers to the Three Brothers Wells Fargo bank accounts.

16.    Rothenhoefer had a strong financial incentive to remain involved with Three Brothers and to conceal the sale from Wells Fargo. Because Rothenhoefer was holding over $2.8 million in seller debt, he needed Moni and Narinder to remain in business so he could continue receiving his monthly payments.

17.    Moni and Narinder had no previous relationship with Wells Fargo. Rothenhoefer knew that Moni and Narinder would not be approved to maintain bank accounts with Wells Fargo, so he kept his name on the accounts to preserve the banking relationship that was essential to Three Brothers' continued operations.

18.    Despite purportedly selling Three Brothers, Rothenhoefer concealed the sale from Wells Fargo.

19.    In June 2023, Wells Fargo conducted an Enhanced Customer Due Diligence ("**EDDC**") review of Three Brothers. At that time, the ownership structure disclosed to Wells Fargo showed that Mark Rothenhoefer retained 90% ownership interest, with Moni and Narinder each holding 5% ownership interest. The EDDC review indicated that Mark Rothenhoefer remained the compliance officer. A true and correct copy of the EDDC report is attached hereto as **Exhibit B**.

20.    In July 2024, Rothenhoefer signed a Customer Information Request form submitted to Wells Fargo certifying that he remained the 90% owner of Rothenhoefer Brothers, Inc. He also certified on that form that he was the compliance officer and signed the document as "President." A true and correct copy of the Customer Information Request form is attached hereto as **Exhibit C**.

21.    Rothenhoefer did not disclose to Wells Fargo that he had sold the business until January 5, 2026, when he returned from an extended trip abroad and informed Wells Fargo that he had sold the business to Moni and Narinder – and only after Wells Fargo discovered the scheme set forth herein.

22.    Rothenhoefer's certifications therefore were false and misleading.

**Defendants Engage in a Fraudulent Check Cashing Scheme**

23.    Beginning in or around April 2025, and continuing through the present, Three Brothers cashed numerous U.S. Treasury checks that were subsequently returned by the U.S. Treasury due to forged endorsements and altered payees (the "***Check Cashing Scheme***").

24.    The attached hereto as **Exhibit D** details the check activity at issue in this matter and is organized into three categories. The first "paid" entries represent checks that Wells Fargo has been able to recover from debiting the Three Brothers' Wells Fargo account. The second "unpaid" category reflects fraudulent checks that have been returned by the U.S. Treasury and have not been covered by the funds in the Three Brothers account, which account for damages suffered by Wells Fargo to date as a result of the Check Cashing Scheme. Finally, the "unknown" category identifies all U.S. Treasury checks exceeding $3,000, originating from outside the State of Maryland, that were deposited beginning in October 2024, which Wells Fargo believes are subject to heightened risk and may also be returned in connection with the Check Cashing Scheme.

25.     Defendants presented the first fraudulent check to Wells Fargo in April 2025, prompting an independent review of Three Brothers. At this time, Wells Fargo attempted to communicate with Rothenhoefer about the issues, but he claimed to be traveling to Aruba for two months.

26.     Checks deposited by Defendants into the Three Brothers Wells Fargo account continued to be returned thereafter. In October 2025, the U.S. Treasury reversed two large checks that Defendants deposited in the Three Brothers Wells Fargo account months earlier due to forged endorsements and altered payees. Wells Fargo collected funds back on these checks totaling $305,655.35.

27.     After Wells Fargo completed an independent audit of the account, Wells Fargo's Enhanced Due Diligence team decided to exit the Three Brothers banking relationship due to the suspicious check activity as well as the customer's failure to timely file Currency Transaction Reports.

28.     Wells Fargo again attempted to contact Rothenhoefer, who they believed throughout this time was still the owner, but he remained out of the country for an extended period. In his absence, Rothenhoefer directed Wells Fargo to speak with Moni.

29.     During a call on or about November 6, 2025, Moni told Wells Fargo that the checks were legitimate and that he had collected photo identification from the individuals cashing them. Moni further claimed that the company waited two weeks before issuing cash for the checks. When Wells Fargo advised Moni that he should no longer be cashing these checks given that several checks had been returned as forgeries, Moni agreed to cease doing so.

30.     Despite Moni's representations that the checks were legitimate and agreement to stop cashing the fraudulent checks, Wells Fargo continued to receive numerous additional returned

checks based on forged endorsements and altered payees. Most of the returned checks had been cashed in June, July, and August 2025.

31.     On December 4, 2025 Wells Fargo sent an exit letter advising Three Brothers to seek banking elsewhere. Wells Fargo communicated this decision to Moni, and made Rothenhoefer aware of the formal exit the week of December 10, 2025.

32.     The fraudulent checks at issue bear the names of payees who have denied receiving, signing, cashing, or depositing the checks in question.

33.     Each payee has filed a claim against the United States for the proceeds of the government check, asserting that the negotiation was unauthorized.

34.     The U.S. Treasury has issued Notices of Direct Debit to Wells Fargo seeking reclamation of these fraudulently negotiated checks through Defendants Check Cashing Scheme. The fraudulent checks bear endorsements indicating they were deposited into the Three Brothers account at Wells Fargo, Account No. 2000026954743. Representative samples of such notices are collectively attached hereto as **Exhibit E** (redacting personal information of the payees).

**Rothenhoefer's Disclosure of the Sale and After Wells Fargo's Discovery of the Scheme**

35.     On January 5, 2026, Rothenhoefer purportedly returned from a trip abroad and first informed Wells Fargo that he had sold the business to Moni and Narinder.  On that date, he first disclosed that the new owners were backed by a "private investment group" that was helping to fund the operation.

36.     The next day, on January 6, 2026, Wells Fargo received notice that a $155,000 check that deposited to the Three Brothers account was presented for return and reversal. Wells Fargo called Moni to inform him and asked when he would have the money to cover the reversal. Moni requested a one-week grace period to gather the funds.

37.     During this time, Moni attempted to deposit more checks through the ATM, but the checks were rejected.

38.     During this time period, Wells Fargo called Moni daily for updates, but Moni became unresponsive.

39.     On January 22, 2026, Wells Fargo made the decision to debit the Three Brothers account to recover the outstanding funds. This debit overdrew the account by $25,000.

40.     Since the debit, neither Moni nor Narinder has responded to Wells Fargo's emails or returned calls.

### Rothenhoefer's Knowledge and Involvement

41.     Rothenhoefer was aware of his obligation to notify Wells Fargo of any change in ownership of the Three Brothers business.

42.     Despite claiming that he sold the business in December 2021, Rothenhoefer continued to represent to Wells Fargo that he remained the majority owner through at least July 2024.

43.     Had Wells Fargo known that Rothenhoefer had sold the business to Moni and Narinder, Wells Fargo would have required updated due diligence and beneficial ownership documentation. Wells Fargo would not have continued the banking relationship with Three Brothers under the same terms.

44.      As a direct and proximate result of Defendants' conduct, Wells Fargo has suffered and continues to suffer damages to its business, including but not limited to losses from the fraudulent check cashing scheme and costs incurred in attempting to recover funds from the U.S. Treasury reclamation process.

<u>COUNT I</u>

**Fraud (Against all Defendants: Rothenhoefer, Moni, Narinder, and Three Brothers)**

45.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

46.    Plaintiff brings this claim against all Defendants.

47.    Defendants knowingly made material misrepresentations to Wells Fargo with the intent to deceive and defraud, upon which Wells Fargo reasonably relied to its detriment, as follows.

*Rothenhoefer's Fraudulent Ownership Misrepresentations and Concealment*

48.    Despite selling the Three Brothers business to Moni and Narinder in December 2021, Rothenhoefer knowingly made false representations to Wells Fargo regarding his continued ownership of the business.

49.    In June 2023, during Wells Fargo's Enhanced Customer Due Diligence review of Three Brothers and through communications with Wells Fargo's offices, Rothenhoefer falsely represented that he retained a 90% ownership interest in Three Brothers and that he remained the company's compliance officer, when in fact he had already sold the business to Moni and Narinder approximately eighteen months earlier.

50.    On or about July 27, 2024, Rothenhoefer signed and submitted to Wells Fargo a Customer Information Request form in which he falsely certified that he remained the 90% owner of Rothenhoefer Brothers, Inc., that he was the compliance officer, and signed the document as "President," when in fact he had transferred ownership of the business to Moni and Narinder more than two and a half years earlier.

51.    Rothenhoefer made these false representations knowingly and with the intent to deceive Wells Fargo and induce Wells Fargo to continue its banking relationship with Three

Brothers under terms that would not have been available had Wells Fargo known of the true ownership structure.

52.     Rothenhoefer had a strong financial incentive to conceal the sale; he was holding over $2.8 million in seller debt and needed Moni and Narinder to maintain banking operations so he could continue receiving his monthly payments of $40,000 on the seller note. Rothenhoefer knew that Moni and Narinder would not be approved to maintain bank accounts with Wells Fargo on their own, so he kept his name on the accounts to preserve the banking relationship that was essential to Three Brothers' continued operations and his ability to collect on his seller note.

53.     The relationship between Wells Fargo and Rothenhoefer was critical because once a forged check is deposited, Wells Fargo must necessarily rely upon it, without any recourse once it is reversed by the payee.

*Fraudulent Check Cashing Scheme*

54.     Beginning in or around April 2025 and continuing through the present, Moni, Narinder, and Three Brothers cashed numerous U.S. Treasury checks that bore forged endorsements and altered payees, and deposited these fraudulent checks into the Three Brothers account at Wells Fargo, Account No. 2000026954743. Each check presented to Wells Fargo constituted a fraudulent misrepresentation that the check was validly endorsed and authorized for payment.

55.     Moni, Narinder, and/or Three Brothers presented multiple U.S. Treasury checks for deposit that they knew or should have known bore forged endorsements and altered payees. The payees whose names appear on the fraudulent checks have filed claims against the United States, each attesting under penalty of perjury that they did not receive, sign, cash, deposit, or authorize the cashing of the checks in question, and that they received no benefit from the checks. The U.S.

Treasury has issued Notices of Direct Debit to Wells Fargo seeking reclamation of these fraudulently negotiated checks.

56.     On or about November 6, 2025, when confronted by Wells Fargo about the returned checks, Moni knowingly and falsely told Wells Fargo that the checks were legitimate and that he had collected photo identification from the individuals cashing them. Moni agreed to cease cashing such checks but thereafter continued to deposit additional fraudulent checks knowingly.

57.     Moni and Narinder are the operators engaged in the Check Cashing Scheme component of Three Brothers. Rothenhoefer directed Wells Fargo to communicate with Narinder and Moni and when Wells Fargo did, they denied the Check Cashing Scheme.  Nonetheless, the check cashing activity continued with Moni, Narinder, Three Brothers, and Rothenhoefer's knowledge of the falsity of the checks. Indeed, numerous fraudulent checks from the Check Cashing Scheme continued to be returned as fraudulent after the November 6, 2025 conversation.

*Reliance and Damages*

58.     Wells Fargo reasonably relied on Defendants' material misrepresentations in maintaining its banking relationship with Three Brothers and in honoring the fraudulent checks presented for deposit. Had Wells Fargo known that Rothenhoefer had sold the business, Wells Fargo would have required updated due diligence and beneficial ownership documentation and would not have continued the banking relationship with Three Brothers under the same terms. Had Wells Fargo known the true nature of the checks being cashed, it would not have honored them.

59.     To date Wells Fargo has incurred damages of $321,187.35 due to the returned checks alone, but Wells Fargo believes there could be damages exceeding $4,000,000 based upon the number of U.S. Treasury checks deposited by Defendants which were payable to payees

located outside of Maryland and which exceeded a certain threshold amount. Wells Fargo's reliance on Defendants' misrepresentations was the direct and proximate cause of its damages.

60.     Because Defendants acted wantonly, maliciously, recklessly, deliberately, and with intent to defraud Plaintiff for the purpose of enriching themselves at Plaintiff's detriment, Defendants' conduct warrants punitive damages in an amount to be determined at trial.

<u>**COUNT II**</u>
**Civil Conspiracy (Against all Defendants)**

61.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

62.     Defendants' conduct described herein constitutes an agreement between two or more parties to commit an unlawful act or a lawful act by unlawful means and Defendants' overt acts in furtherance of this conspiracy caused Plaintiff's damages.

63.     Defendants aided and abetted one another to violate federal laws and commit fraud.

64.     Each Defendant agreed to and carried out acts in furtherance of the Check Cashing Scheme.

65.     Each Defendant made a conscious commitment to participate in the Check Cashing Scheme.

66.     The Defendants agreed with each other to engage in the following conspiratorial conduct:

   a.   <u>The Concealed Sale Agreement</u>: In December 2021, Rothenhoefer sold Three Brothers to Moni and Narinder through a seller-financed transaction involving a $2,828,581.11 Note requiring monthly payments of $40,000, secured by an Indemnity Deed of Trust on properties at 3061, 3111, and 3125 Frederick Avenue in Baltimore, Maryland.

      b.  <u>Agreement to Conceal Ownership from Wells Fargo</u>: Despite the sale, Defendants agreed to conceal the ownership change from Wells Fargo. Rothenhoefer continued to represent himself as the 90% owner and compliance officer (including during the June 2023 Enhanced Customer Due Diligence review and on the July 27, 2024 Customer Information Request form) knowing that Moni and Narinder could not maintain the banking relationship on their own.

      c.  <u>Agreement to Conduct the Fraudulent Check Cashing Scheme:</u> Beginning in April 2025, Defendants agreed to deposit U.S. Treasury checks bearing forged endorsements and altered payees into the Three Brothers Wells Fargo account, with Rothenhoefer providing the appearance of legitimacy that allowed the scheme to continue.

67.    Each Defendant shares a common purpose of perpetuating the Check Cashing Scheme and each Defendant alone could not have accomplished the Check Cashing Scheme without their co-conspirators.

68.    Rothenhoefer needed Moni and Narinder to remain in business so he could continue receiving his monthly $40,000 payments on the seller Note. Because Rothenhoefer was holding over $2.8 million in seller debt, he had a direct financial interest in ensuring Three Brothers maintained its banking relationship with Wells Fargo.

69.    Moni and Narinder needed Rothenhoefer to maintain his name on the Wells Fargo accounts because they knew they would not be approved to maintain bank accounts with Wells Fargo on their own. Without Rothenhoefer's continued participation in the fraud, they could not have conducted the Check Cashing Scheme through the Wells Fargo accounts.

70.    The Check Cashing Scheme required the coordinated efforts of all Defendants: Rothenhoefer's fraudulent representations regarding ownership, Moni and Narinder's operation of the check cashing business, and Three Brothers as the corporate entity through which the fraudulent checks were processed.

71.    Plaintiff was and continues to be damaged by the conspiracy by having extended banking services to non-creditworthy individuals who would not have qualified for such services absent Defendants' fraudulent concealment of the true ownership, and by having suffered damages by honoring fraudulent checks that were deposited into the Three Brothers account bearing forged endorsements and altered payees.

## COUNT III
### Breach of Contract (Three Brothers)

72.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

73.    Defendant Three Brothers' actions and omissions each constitute a breach of contract.

74.    On or about September 18, 2006, Rothenhoefer, on behalf of Three Brothers, opened a commercial business checking account with Wachovia, Account No. 2000026954743, by executing a Customer Access Agreement (the "**CAA**") and Deposit Account Application (the "**DAA**") shortly thereafter, also in September 2006. A true and correct copy of the CAA is attached hereto as **Exhibit F**, and a true and correct copy of the DAA is attached hereto as **Exhibit G**.

75.    Wells Fargo & Company subsequently acquired Wachovia Corporation and became the successor-in-interest to Wachovia with respect to the Account Agreement and all deposit accounts maintained thereunder.

76.     Rothenhoefer, on behalf of Three Brothers, agreed to be bound by the terms and conditions of the Wells Fargo Commercial Account Agreement (the "***Commercial Account Agreement***"), as amended from time to time, which governs the Three Brothers account. A true and correct copy of the Commercial Account Agreement is attached hereto as **Exhibit H**. Rothenhoefer's agreement to be bound by these terms is reflected in the original CAA.  The CAA states: "I agree to be bound by the terms and conditions including, but not limited to [the bank's] Deposit Agreement and Disclosures, applicable to each product or service which I obtain from [the bank] now or in the future, which terms and conditions will be provided to me." More recently, the Amendment to Commercial Account Signature Card dated January 11, 2022 (the "***Signature Card Amendment***"), signed by Rothenhoefer as President of Three Brothers states: "I acknowledge that the customer has received the Wells Fargo Commercial Account Agreement and agrees its terms and conditions, as amended from time to time, will govern the account(s)." A true and correct copy of the Signature Card Amendment is attached hereto as **Exhibit I**.

77.     Three Brothers, as the account holder and corporate entity in whose name the account is maintained, is bound by the terms and conditions of the Commercial Account Agreement. The Commercial Account Agreement and its incorporated terms constitute valid, binding, and enforceable contracts between Wells Fargo and Three Brothers. Wells Fargo fully performed its obligations under the Commercial Account Agreement by maintaining the Three Brothers account, processing deposits, honoring checks, and providing banking services in accordance with the terms of the agreement.

78.     Three Brothers breached the Commercial Account Agreement by, among other things: (a) failing to promptly notify Wells Fargo of changes to signer authority after selling the

business in December 2021;[1] (b) breaching endorsement warranties under Maryland law by depositing checks with forged endorsements;[2] (c) failing to maintain sufficient funds to cover returned deposited items;[3] and (d) failing to indemnify and repay Wells Fargo for all losses arising from items deposited to the account that were returned unpaid, dishonored, or subject to claims of forgery or altered payees.[4]

79.    As a direct and proximate result of Three Brothers' breaches of the Commercial Account Agreement, Wells Fargo has suffered damages, including but not limited to: (a) losses from the fraudulent check cashing scheme, including amounts reclaimed by the U.S. Treasury through Notices of Direct Debit; (b) the $25,000 overdraft on the Three Brothers account; and (c) costs and expenses incurred in attempting to recover funds and investigate the fraudulent scheme.

---

[1] *See* Commercial Account Agreement, which states: "Upon notifying us of the death or incompetence of a business owner, the business entity will need to provide documentation evidencing any change in the ownership or control of the entity following applicable legal formalities."

[2] *See* Commercial Account Agreement, which states: "What happens if you breach a warranty associated with an item? If you breach any warranty you make to us under the laws governing your account with respect to any item, you will not be released or discharged from any liability for the breach so long as we notify you of the breach within 120 days after we learn of the breach. If we fail to notify you within this 120-day period, you will be released from liability and discharged only to the extent our failure to notify you within this time period caused a loss to you."

[3] *See* Commercial Account Agreement, which states: "If you have an overdraft on your account (including transactions we have paid on your behalf into overdraft, plus any fees), you must promptly make a deposit or transfer to return your account to a positive balance."

[4] *See* Commercial Account Agreement, which states: "you will indemnify, defend, and hold us harmless from and against all liabilities, damages, claims, obligations, demands, charges, costs, or expenses (including reasonable fees and disbursements of legal counsel and accountants) awarded against or incurred or suffered (collectively, "losses and liabilities") by us arising directly or indirectly from or related to the transfer or return of an electronic check or an electronic returned check on your behalf. If we suffer any losses or liabilities arising directly or indirectly from or related to a breach of either the image quality warranty or the no double debit warranty, you will reimburse us and not hold us responsible or liable."

80.     To date Wells Fargo has incurred damages of $321,187.35 due to the returned checks alone, but believes there could be damages exceeding $4,000,000 based upon the number of U.S. Treasury checks deposited by Defendants which were payable to payees located outside of Maryland and which exceeded a certain threshold amount.

81.     Wells Fargo is entitled to recover all damages caused by Three Brothers' breaches, plus pre-judgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT IV**
**Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Against all Defendants)**

82.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

83.     Plaintiff brings this count against all Defendants for violations of 18 U.S.C. § 1962(c).

84.     Defendants are culpable persons who willfully and knowingly committed and conspired to commit two or more acts of mail and wire fraud through a pattern of racketeering activity that involves an association in fact enterprise, the results of which had an effect on interstate commerce.

**A. Defendants are Culpable "Persons" Under RICO**

85.     Defendants Rothenhoefer, Moni, Narinder, and Three Brothers separately as "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

86.     Each one of Defendants Rothenhoefer, Moni, Narinder, and Three Brothers are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

## B. The RICO Enterprise

87.     For the purposes of this claim, the RICO enterprise is the association-in-fact between Defendants Rothenhoefer, Three Brothers, Moni, and Narinder to run the business known as Three Brothers using forged checks and maintaining a fraudulent banking relationship with Wells Fargo.

88.     This association-in-fact enterprise is referred to as the "Three Brothers Enterprise."

89.     The Three Brothers Enterprise is an ongoing and continuing business organization consisting of a corporation and individuals associated for the common purposes of:

   a.   Concealing the December 2021 sale of the Three Brothers business from Wells Fargo to maintain the banking relationship that would not have been approved had the true ownership been disclosed;

   b.   Operating a check cashing business through which U.S. Treasury checks bearing forged endorsements and altered payees could be deposited and converted to cash; and

   c.   Generating revenue for all Defendants: Rothenhoefer through his monthly $40,000 payments on the $2,828,581.11 seller Note, and Moni and Narinder through the operation of the Three Brothers business and the proceeds of the fraudulent check cashing activity.

90.     The Three Brothers Enterprise engaged in the shared purpose of defrauding Wells Fargo by presenting fraudulent checks for deposit, concealing the true ownership of the business, and converting the proceeds of the fraudulent checks to cash.

91.    The members of the Three Brothers Enterprise are bound by contractual relationships, financial ties, and the ongoing coordination of activities.

92.    The Three Brothers Enterprise functions as a continuing but separate unit separate and apart from the pattern of racketeering activities in which it engages. For example, the Three Brothers Enterprise functions as a retail liquor store and licensed money service business offering check cashing, money orders, prepaid access, and money transmission services aside from engaging in wire and bank fraud in furtherance of the Check Cashing Scheme.

93.    At relevant times, the Three Brothers Enterprise was operated and conducted for unlawful purposes by the Defendants, namely, carrying out the Check Cashing Scheme and concealing the true ownership of the business from Wells Fargo.

94.    The Three Brothers Enterprise derived secret profits from these activities that were greater than those any one of the Defendants could obtain absent their misrepresentations regarding and collusion in their Check Cashing Scheme.

95.    The Three Brothers Enterprise resulted in benefits for the Defendants that could not have been achieved absent the Three Brothers Enterprise.

96.    To accomplish this common purpose, each Defendant performed the following acts:

  a.  Rothenhoefer: (i) Sold the business to Moni and Narinder in December 2021 while agreeing to conceal the sale from Wells Fargo; (ii) falsely represented to Wells Fargo during the June 2023 Enhanced Customer Due Diligence review that he retained a 90% ownership interest and remained the compliance officer; (iii) signed and submitted the July 27, 2024 Customer Information Request form falsely certifying his 90% ownership, compliance officer status, and signing as

"President"; (iv) continued to take calls from Wells Fargo through November and December 2025 acting as if he was still the owner; and (v) provided instructions to Wells Fargo to communicate with Moni while he was traveling abroad, knowing the fraudulent scheme was ongoing.

b. <u>Moni and Narinder</u>: (i) Purchased the business from Rothenhoefer in December 2021 while agreeing to conceal their true ownership from Wells Fargo; (ii) operated the Three Brothers business and its check cashing operations; (iii) deposited U.S. Treasury checks bearing forged endorsements and altered payees into the Three Brothers Wells Fargo account beginning in or around April 2025; (iv) when confronted by Wells Fargo about the returned checks on November 6, 2025, Moni falsely claimed the checks were legitimate and that he had collected photo identification from the individuals cashing them; (v) agreed to cease cashing such checks but continued to deposit additional fraudulent checks thereafter; and (vi) made monthly payments of $40,000 to Rothenhoefer on the seller Note, giving Rothenhoefer a continuing financial interest in the success of the scheme.

c. <u>Three Brothers</u>: Served as the corporate vehicle through which the Check Cashing Scheme was conducted, maintaining the Wells Fargo account into which the fraudulent checks were deposited and from which the proceeds were withdrawn.

97.    Each Defendant did so willfully and with knowledge that Plaintiff was cashing checks they had forged.

98.    None of the Defendants alone could have accomplished the purposes of the Three Brothers Enterprise without the other members of the enterprise.

### C.  The Three Brothers Enterprise Misrepresented and Failed to Disclose Material Facts in Furtherance of the Check Cashing Scheme

99.    The Three Brothers Enterprise knowingly made material misrepresentations to the public and to the Plaintiff in furtherance of the Check Cashing Scheme, including:

a.   Falsely representing that Rothenhoefer continued to own 90% of the Three Brothers business when in fact he had sold the business to Moni and Narinder in December 2021;

b.  Falsely representing that Rothenhoefer remained the compliance officer responsible for overseeing and maintaining Three Brothers' compliance program when in fact he had transferred this responsibility;

c.  Presenting U.S. Treasury checks for deposit that bore forged endorsements and altered payees, each of which constituted a representation that the check was validly endorsed and authorized for payment; and

d.  Falsely representing to Wells Fargo on November 6, 2025 that the returned checks were legitimate and that proper identification had been collected from the individuals cashing them.

100.    Each forged check issued by the Defendants constituted a material misrepresentation to Plaintiff.

101.    Each document Rothenhoefer signed representing his continued ownership of Three Brothers, including the June 2023 Enhanced Customer Due Diligence representations and the July 27, 2024 Customer Information Request form, constituted a material misrepresentation to Plaintiff.

102.    At all times relevant to this Complaint, the Three Brothers Enterprise knew the above-described representations to be false.

103.    At all times relevant to this Complaint, the Three Brothers Enterprise intentionally made these representations for the purpose of inducing Plaintiff into maintaining the banking relationship with Three Brothers and honoring the fraudulent checks presented for deposit.

104.    Plaintiff relied on the material misrepresentations and omissions made by the Three Brothers Enterprise in maintaining the banking relationship and in honoring each of the fraudulent checks.

105.    Without these misrepresentations and each Defendant's failure to disclose the Check Cashing Scheme, the Three Brothers Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to honor the fraudulent checks.

### D.  Defendants' Impact on Interstate Commerce

106.    The Three Brothers Enterprise engaged in and affected interstate commerce by depositing U.S. Treasury checks issued by the United States Treasury from Kansas City, Missouri, and payable to payees located outside of Maryland into the Three Brothers Wells Fargo account in Baltimore, Maryland.

107.    The Three Brothers Enterprise engaged and utilized the United States banking system and a series of bank transmissions of funds and fraudulent checks between or among states.

### E.  Conduct of the Three Brothers Enterprise's Affairs

108.     Each Defendant participates in the operation and management of the Three Brothers Enterprise and, in violation of Section 1962(c) of RICO, conducts or participates in the conduct of the affairs of the association-in-fact RICO enterprise, directly or indirectly. Upon information and belief:

        a.  Rothenhoefer directed and controlled the concealment of the ownership change by signing compliance documents and Customer Information Request forms

representing his continued 90% ownership, participating in Enhanced Customer Due Diligence reviews, and maintaining his name on the Wells Fargo accounts to preserve the banking relationship;

b.  Moni directed and controlled the day-to-day operations of the check cashing scheme, depositing fraudulent checks, communicating with Wells Fargo representatives, and making false representations regarding the legitimacy of the checks; and

c.  Narinder participated in the operation of the Three Brothers business and benefited from the proceeds of the Check Cashing Scheme. He was also one of the two purported purchasers and operators of Three Brothers and, upon information and belief, participated in and concealed the Check Cashing Scheme.

### F.  Defendants' Patterns of Racketeering Activity

109.    Each Defendant's pattern of racketeering involved at least two separate instances wire and/or bank fraud in furtherance of the Check Cashing Scheme in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1344 (bank fraud).

110.    Each of these representations and transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Defendant intended to defraud Plaintiff.

111.    By depositing forged and altered U.S. Treasury checks into the Wells Fargo banking system and by subsequently failing to disclose such practices to Plaintiff, each Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

112.    Each Defendant's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

113.    Each separate misrepresentation to Plaintiff and each separate instance of use of the United States banking system through interstate wires employed by each Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

114.    Each Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Three Brothers Enterprise with which each of them is and was associated in fact.

### G. The Check Cashing Scheme Injured Plaintiff

115.    The Three Brothers Enterprise's violations of federal law and pattern of racketeering activity have directly and proximately caused the Plaintiff to be injured in its business or property.

116.    Plaintiff has been, and continues to be, injured by:

a.  Honoring U.S. Treasury checks bearing forged endorsements and altered payees that were deposited into the Three Brothers account and subsequently subject to reclamation by the U.S. Treasury;

b.  Extending banking services to Three Brothers under terms that would not have been available had Wells Fargo known the true ownership structure of the business;

c.  Costs incurred in attempting to recover funds from the U.S. Treasury reclamation process; and

d.  The overdraft of the Three Brothers account following Wells Fargo's debit to recover outstanding funds on January 22, 2026.

<u>COUNT V</u>
**Violations of CIVIL RICO, 18 U.S.C. § 1962(d) (Against all Defendants)**

117.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

118.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

119.    Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Check Cashing Scheme.

120.    As set forth in detail above, Defendants each knowingly agreed to facilitate the Check Cashing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically:

    a.  In December 2021, Rothenhoefer, Moni, and Narinder agreed to conceal the sale of the Three Brothers business from Wells Fargo to preserve the banking relationship;

    b.  Rothenhoefer made false representations to Wells Fargo during the June 2023 Enhanced Customer Due Diligence review regarding his continued ownership and compliance officer status;

    c.  Rothenhoefer signed and submitted the July 27, 2024 Customer Information Request form containing false certifications regarding ownership;

    d.  Beginning in or around April 2025, Moni, Narinder, and Three Brothers deposited U.S. Treasury checks bearing forged endorsements and altered payees into the Wells Fargo account;

e.  On November 6, 2025, Moni made false representations to Wells Fargo regarding the legitimacy of the returned checks; and

f.  Moni continued to deposit additional fraudulent checks after agreeing to cease such activity.

121.  The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. Each time Defendants deposited a forged check, they violated federal law.

122.  Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.  multiple instances of wire fraud in violation of 18 U.S.C. § 1343; and

b.  multiple instances of bank fraud in violation of 18 U.S.C. § 1344;

123.  These predicate acts are evidenced by the specific wire transmissions and banking transactions included on Exhibits D and E, attached hereto, which include the date and content of each fraudulent misrepresentation.

124.  Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid at least $295,647.49 in cashing forged checks to date and has had to cover an additional overdrawn amount of $25,539.86 which it would not have done but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c). This number will only continue to climb as more fraudulent checks are returned.

125.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages this District has sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT VI**
**Unjust Enrichment (Against all Defendants)**

126.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

127.    This cause of action is alleged in the alternative to any claim Plaintiff may have for legal relief.

128.    It is a fundamental principle of fairness and justice that a person should not be unjustly enriched at the expense of another.

129.    Plaintiff conferred a benefit upon Defendants by accepting and crediting the Three Brothers accounts based upon forged checks and/or checks with altered payees through Defendants' Check Cashing Scheme.

130.    Plaintiff conferred this benefit upon Defendants to Plaintiff's financial detriment.

131.    Defendants deceived Plaintiff and have received a financial windfall from the Check Cashing Scheme at Plaintiff's expense.

132.    Defendants wrongfully secured and retained a benefit in the form of amounts paid for forged and/or altered U.S. Treasury checks and revenues that would not have been realized but for the Check Cashing Scheme.

133.    Defendants wrongfully secured and retained a benefit in the form of money paid to Three Brothers based upon forged and/or altered U.S. Treasury checks which were obtained at Plaintiff's expense.

134.    Defendants wrongfully secured and retained a benefit in the form of money paid to Three Brothers based upon forged and/or altered U.S. Treasury checks that would not have existed but for the Defendants' misconduct.

135.    Defendants were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which they were not entitled, all at Plaintiff's expense.

136.    Any Defendant's retention of any portion of any benefit obtained by way of the Check Cashing Scheme is unjust and inequitable.

137.    Each Defendant's retention of any portion of the benefit violates the fundamental principles of justice, equity, and good conscience. Even absent Plaintiff's ability to prove the elements of any other claim, it would be unfair, unjust, and inequitable for any Defendant to retain any portion of the benefit.

138.    Even absent legal wrongdoing by any or all Defendants, Plaintiff has a better claim to the benefit than any Defendant.

139.    The benefit retained is in an amount not less than $321,187.35 currently.

140.    Defendants should not be permitted to retain the benefit conferred upon them by Plaintiff and restitution is appropriate to prevent the unjust enrichment.

141.    Accordingly, Plaintiff seeks disgorgement of the benefit and seeks restitution, rescission, or such other relief as will restore to Plaintiff that to which it is entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    A judgment in favor of Plaintiff and against Defendants;

2.    Determining that the applicable Defendants have violated RICO, have conspired to violate RICO, have committed common-law fraud and fraudulent concealment, have breached the

Commercial Account Agreement, have engaged in a civil conspiracy, and have been unjustly enriched.

3.      Damages, treble damages, statutory damages, and punitive damages, where applicable;

4.      Restitution, disgorgement, and other just relief;

5.      Enter money judgments in Plaintiff's favor against Defendants in amounts to be proven at trial, but for no less than the following:

        a.      $321,187.35, in addition to all amounts later discovered upon the return of fraudulent checks.

6.      Award Plaintiffs their costs and reasonable attorneys' fees; and

7.      Grant such other relief as may be necessary and proper.


Dated this 13th day of March 2026.

*/s/ Daniel Z. Herbst*
Daniel Z. Herbst (D. Md. Bar No. 17510)
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, DC 20005-3317
Telephone:  202 414 9200
Facsimile: 202 414 9299
dherbst@reedsmith.com

Devan J. Dal Col*
REED SMITH LLP
7900 Westpark Drive
Suite T700
McLean, VA 22102
Telephone:  703 641 4200
Facsimile: 703 749 9075
ddalcol@reedsmith.com
*Application pro hac vice forthcoming*

*Counsel for Plaintiff*

- 30 -